IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE:  C.R. FIELDS, III, DEBTOR                    CASE NO.: 4:14-bk-11088
                                                    CHAPTER 7

RICHARD M. COLEMAN, JR.                             PLAINTIFF

V.                        AP NO.: 4:14-ap-01055

C.R. FIELDS, III
A/K/A RANDY FIELDS, III, INDIVIDUALLY
AND DOING BUSINESS AS
ARKANSAS WINDOWS & SIDING                           DEFENDANT

## MEMORANDUM OPINION AND ORDER

Richard M. Coleman, Jr. ("Coleman") filed his *Complaint* against the debtor/defendant, C. R. Fields, III ("debtor"), individually and doing business as Arkansas Windows & Siding, seeking to establish damages under Arkansas law for breach of contract, unjust enrichment, fraud, and violation of the Arkansas Deceptive Trade Practices Act.  Commensurately, the Complaint alleges that any resulting indebtedness should be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (4), or (6).  The Complaint and the debtor's *Answer to Complaint* came on for trial on October 28 and 29, 2015.  The parties appeared personally and by and through their counsel.  At the conclusion of trial, the court took this matter under advisement.

For the reasons stated below, the court awards Coleman damages in the amount of $35,000 for breach of contract and unjust enrichment.  Coleman shall have fifteen days from the entry of this Memorandum Opinion and Order within which to submit a verified statement of his costs and attorney's fees incurred.  The debtor shall have ten days thereafter within which to respond or otherwise object to the fee request.  Without a hearing, the court will determine the appropriate costs and fee amount.  Further, the damages, costs, and attorney's fees are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), for false pretenses and false

representations. A final order and separate judgment shall be entered after considering the costs and fee request as stated above.

## I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (J). The following opinion and order constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Findings of Fact

### A. The Contract

The debtor and his wife, Anna Fields, operated a business under the name Arkansas Windows & Siding ("AWS"). Coleman, seventy-seven years old at the time, owned a home in Searcy, Arkansas, and asked the debtor to give him a bid for home improvements.

On September 12, 2012, Coleman and AWS executed an agreement ("Contract") for construction work on Coleman's home in the amount of $67,114. (Ex. A.) The work scope included windows, siding, and roofing. Although termed a Proposal between Coleman and AWS, the parties conceded at trial that the Contract (1) was a binding contract and (2) individually obligated the debtor. Coleman testified that it was important to him that the debtor was a licensed contractor capable of timely and appropriately obtaining materials and labor for the project. The debtor conceded that he represented to Coleman that he was capable, had the ability to obtain labor and necessary materials, and could complete the job in a timely and professional manner. Further, the debtor admitted that Coleman entered into the Contract based on the debtor's representations.

The Contract called for a $35,000 down payment.  (Ex. A.)  On September 13, 2012, the day after the parties signed the Contract, Coleman delivered a cashier's check in the amount of $35,000 to Anna Fields.  Anna Fields deposited the check that same day in the AWS business account with Arvest Bank.  (Ex. B.)

The parties expected that work would begin immediately.  On September 14, 2012, an AWS employee arrived at Coleman's home and measured for replacement windows; another employee came out to the house and did some preliminary concrete work.  The next firm date referenced is September 27, 2012, when the debtor and John Redditt ("Redditt") came to Coleman's house to discuss tearing down the deck.

Although the exact timing is not entirely clear, Coleman asked the debtor to stop working on the project for a period of time while Coleman went on vacation.  Coleman thought work was to recommence on October 15, 2012; the debtor concurred.  According to Coleman, the debtor came to his house on October 16, 2012, and informed Coleman that there had been a theft by one of his employees, that his $35,000 down payment had been stolen, and that the employee had paid for other projects with company money.

Both sides agree that the debtor then essentially offered, either directly or through a former employee, to complete the project with Coleman paying for labor and materials.  The debtor represented that he would attempt to oversee the project, would keep costs to a minimum, and could possibly complete the project for about the same amount as the original Contract.  This effort failed completely within a few days.   According to Coleman, the debtor basically disappeared.

Coleman spoke to the debtor for the last time on October 23, 2012.  Coleman told the debtor he should continue as the contractor.  The debtor was unwilling or unable.  At the debtor's

recommendation, Gary Montgomery ("Montgomery"), an individual who had worked for AWS, assisted Coleman in completing the project. Montgomery worked for AWS "until the very end" and had already worked on Coleman's project. But, he was no longer receiving direction from the debtor. Coleman paid Montgomery directly thereafter. No one else performed any work on behalf of the debtor, and Coleman completed the project with Montgomery's assistance. Around this time, AWS ceased doing business.

Of the $35,000 down payment, the debtor used no more than $1100 towards the Contract. He indicated that he may have paid Redditt anywhere from $600 to $1100 but could not be more specific. The debtor did not apply the balance of the down payment to the performance of his Contract with Coleman. Rather, he used the money to pay salesmen, operating expenses, employees, and vendors. Anna Fields, also the bookkeeper for AWS, acknowledged that a small percentage went to personal use. The debtor already knew he was behind financially and his business was having a difficult time when he took the down payment. He did not tell Coleman that he was going to use the down payment for purposes other than completion of the Contract.

The debtor conceded that (1) he wholly failed to perform under the terms of the Contract and is in breach, and (2) his inability to obtain materials and pay employees, both circumstances attendant to AWS closing its business, occasioned this default. The debtor testified, however, that he did not think he was going out of business at the time he executed the Contract in September of 2012 as he had ongoing projects that he was completing each week. Only thereafter, while he was working on two or three other projects plus Coleman's Contract, did he realize he could not get any more materials or pay his employees. The debtor assigned most of the blame for AWS's problems on a "bad month" resulting from a salesman who underbid projects, took kickbacks, and otherwise stole in an unspecified manner from the business.

## B. AWS's and the Fields' Finances in Fall 2012

In his Complaint, Coleman alleges that the debtor "knew at the time that he entered into the Contract" that he "would not use the money for the purposes set forth in the [C]ontract," he "preyed upon Coleman for pecuniary gain with no intention of completing the work required by the [C]ontract or repaying any of the down payment," and he lacked the ability "to obtain the materials and labor necessary to complete the [C]ontract" in a timely and professional manner consistent with all applicable building codes.  (Comp., June 2, 2014, ECF No. 1, at ¶¶ 17, 23, and 25.)  These allegations, denied by the debtor, require scrutiny of the debtor's business and personal financial circumstances at the time he entered into the Contract and obtained the $35,000 down payment.

In 2012, the sole source of income for both the debtor and Anna Fields was AWS.  The debtor could not precisely state when he closed AWS.  He testified that he closed the doors in late October or early November 2012.  He conversely characterized it as within a "few weeks" after receiving the $35,000 down payment from Coleman, which would indicate a closing in late September.

At trial, the debtor sought to isolate his financial problems to a "bad month" while Coleman was on vacation.  The debtor testified that no one stole the $35,000 from him.  Rather, he had a salesman that was under bidding jobs and taking kickbacks; the debtor did not file a police report or otherwise pursue the salesman.   Anna Fields, however, testified that the problems with the salesman, Scott Williams ("Williams"), were long-standing.  According to her, the problems started in October 2011 with Williams "selling a job short."  That is, the first sign was in 2011 when AWS lost approximately $5500 on a job.  AWS suffered additional losses in 2012:  an approximate $17,000 loss in the spring of 2012 and losses on two sunrooms in the

5

spring or summer of 2012.  Notwithstanding those warning signs, Anna Fields testified that the losses came on them "suddenly" as jobs took a few months to complete with some good sales in between.  Although Anna Fields knew things were going bad in the spring and summer of 2012, she insisted that the problems came to their attention after executing the Contract with Coleman.

In contrast to the testimony of Anna Fields and the debtor, Montgomery testified that he knew the debtor was trying to close up AWS about a month before it actually closed.  He also confirmed issues with a salesman.  Montgomery understood that the debtor was in a "bad way" at the end.

### 1.  The Debtor's and Anna Fields's Bankruptcies

The debtor filed his Chapter 7 bankruptcy on February 26, 2014.  (Ex. D.)  Thus, his schedules are not very illustrative of his or AWS's financial circumstances in September 2012.  (Ex. D.)  Anna Fields, however, filed an earlier and separate personal bankruptcy on December 7, 2012.  (Ex. J.)  She served as AWS's bookkeeper and shared responsibility for its debts.  Because of the proximity of her bankruptcy to the events of September 2012, her schedules provide more insight into their collective financial condition in the fall of 2012.

In her schedules, Anna Fields reported that AWS ended operations in October 2012.  (Ex. J, No. 18, at 28.)  She testified it was mid-October.  She reported no residual assets in or business value from AWS.  The AWS Arvest Bank business account had a zero balance; likewise, she valued her interest in AWS at zero.  (Ex. J, Sch. B, at 9–10.)  She disclosed only a $200 balance in her personal banking account that she shared with the debtor.  (Ex. J, Sch. B, at 9.)  Almost all of her accumulated personal property was in the form of two vehicles and a boat.  (Ex. J, at 11.)  None of her secured debt appeared to relate to AWS.  (Ex. J, at 13.)  She listed significant priority tax debts: $20,000 owed to the Arkansas Department of Finance and Administration and

$88,000 owed to the Internal Revenue Service.  (Ex. J, at 15.)  Anna Fields testified that the tax debt was for years prior to 2012.  Her testimony was unclear whether the IRS debt was solely personal to Anna Fields or otherwise related to AWS.

Neither the debtor nor Anna Fields was employed as of December 7, 2012, and they were accumulating living expenses in the amount of $5242.43 a month.  (Ex. J, Sch. J, at 32–33.)  They paid $1190.12 for their mortgage and $511 per month for their vehicle.  (Ex. J, Sch. I, at 33.)  Anna Fields started working for Maid Scents, LLC, a housecleaning service, in October of 2012, but reported no income from the same on her schedules.  (Ex. J, Sch. I, at 32; Ex. J, SFA Nos. 1 and 18, at 40.)

In her Statement of Financial Affairs, Anna Fields reported a 2012 year-to-date gross income from AWS of $50,000.  (Ex. J, SFA No. 1, at 35.)  When examined on that figure, she testified that she understood that amount to be a net figure despite the wording of the question.  She listed no other source of income.  (Ex. J, SFA No. 2, at 35.)  She also indicated in her Statement of Financial Affairs that she had made no payments on consumer or business debts within 90 days prior to her case in excess of the respective $600 and $5850 thresholds.  (Ex. J, SFA No. 3, at 36.)

Anna Fields accumulated unsecured, nonpriority debts of $406,920.51 as of December 7, 2012.  (Ex. J, at 29.)  The debt overwhelmingly related to AWS's operations.  For example: AWS's principal supplier, All American Building Supply, was owed $47,000.  (Ex. J, at 16.)  AT&T Advertising and Publishing was owed $17,000.  (Ex. J, at 18.)  Bill's Fence Company, Inc. was owed $4300.  (Ex. J, at 18.)  The Hilburn Law Firm was owed $3800.  (Ex. J, at 21.)  Home Depot Credit Services was owed $5300.  (Ex. J, at 21.)  Robert and Tahya [sic] Johnson were owed $6905.  (Ex. J, at 22.)  Lamar Companies was owed $7400.  (Ex. J, at 23.)  The Iberia

business line of credit was owed $15,000. (Ex. J, at 22.) Lumber One Home Center was owed $17,000. (Ex. J, at 23.) Jerald and Kelly Noble were owed $8064. (Ex. J, at 24.) Norandex was owed an AWS debt of $56,000. (Ex. J, at 24.) Peeples Bros Supply Inc. was owed $3500. (Ex. J, at 25.) Plymouth Building Products was owed $40,000. (Ex. J, at 25.) An AWS related debt of $53,500 was owed to RMS in East Hartford, Connecticut. (Ex. J, at 26.) Shelter Distribution was owed $5800. (Ex. J, at 27.) Spec Building Material was owed $8800. (Ex. J, at 27.) US Bank was owed $4500 on an AWS related credit card. (Ex. J, at 29.) Waste Corporation was owed $2100 for services to AWS. (Ex. J, at 28.) Whit Davis Lumber was owed $15,000. (Ex. J, at 29.) Windowmart was owed $21,000. (Ex. J, at 29.)

Anna Fields testified that most of the debts accumulated during the spring and summer of 2012. She indicated that fall was the most dangerous time for the business, but they typically recovered. However, the fall of 2012 was atypical as too much "dominoed" on them. She testified that although some of the jobs were "under" sold she thought they could recover but realized otherwise when lawsuits were filed.

As of December 7, 2012, Anna Fields was a defendant in four collection suits filed by AWS creditors. (Ex. J, SFA No. 4, at 36.) Each lawsuit contributes to an understanding of AWS's financial circumstances in mid-September 2012. As detailed in the invoices attached to the various complaints, the debts accrued prior to the execution of the Contract with Coleman on September 12, 2012.

Kaufman Lumber Company filed suit against AWS and Anna Fields on September 20, 2012, following a certified letter demand for $4463.05 on August 15, 2012. (Ex. K.) Excepting service charges, the principal unpaid debt had fully accrued by March 2012 for product shipped to AWS in February 2012. (Ex. K.)

Lumber One Home Center sued AWS and the debtor on August 23, 2012, for $10,986.63 (amended to $17,106.72 on August 29, 2012).  (Exs. F, G.)  This balance accrued between April and June of 2012 and remained unpaid.  (Exs. F, G.)  Spec Building Materials Corporation sued AWS and Anna Fields for $8705.34 on September 25, 2012, for materials and supplies invoiced between April and July of 2012.  (Ex. L.)  Browning Redi-Mix sued AWS, the debtor, and Anna Fields on November 30, 2012, for $375.96 for concrete delivered on July 5, 2012.  (Ex. N.)

Window Mart Manufacturing, LLC, a principal vendor of AWS, sued AWS and Anna Fields on November 26, 2012, for $20,788.80.  (Ex. M.)  The charges, for custom vinyl windows, accumulated from May through October of 2012; $18,925.19 of the balance had accumulated by August, 2012.[1]  (Ex. M.)  Anna Fields testified that when AWS placed an order with Window Mart for the Coleman job, she knew that they already owed a balance, but she felt AWS still had sufficient credit.  She acknowledged that Coleman had to pay for his windows.

Not listed on Anna Fields's Statement of Financial Affairs was a lawsuit filed by Sunrise Windows, LLC against AWS, the debtor, and Anna Fields on October 31, 2012.  (Exs. H, I.)  The attachments to the complaint reflect a balance owed of $12,947.01 but do not reflect the pertinent invoice dates.  (Exs. H, I.)

### 2. The AWS Arvest Bank Account—September 2012

In addition to Anna Fields's schedules from her December 2012 bankruptcy filing, AWS's business account provides insight into the deteriorated financial condition of AWS at the time the parties executed the Contract.  AWS maintained its business account at Arvest Bank.  Coleman introduced the business account statements from July 31, 2012, through November 30,

---

[1] The numbers on the account summary are difficult to discern.  Possibly two transactions accumulated after August, one for $1800.94 and one for $62.67, totaling $18,925.19.

2012.  (Exs. P–T.)  The account statements paint a picture of an undercapitalized business in consistent, ongoing, and severe financial distress.  Specifically, the July 31, 2012 statement reflected a June 30, 2012 beginning balance of $4878.72 and an ending balance of $344.04.  (Ex. P.)  The July statement included deposits of $107,448.57 against debits of $111,912.52.  (Ex. P.)  Their efforts to coordinate receivables with payables appear problematic; the July account statement reflected seventy-two insufficient fund charges.[2]  (Ex. P.)  Of the twenty-two days reported on the Daily Balance Summary, fourteen days detailed negative daily balances.  (Ex. P, at 4.)  AWS relied on its overdraft protection to juggle its payables.  (Ex. P.)

August 2012 was not any better.  The previous balance of $344.04 increased by deposits of $122,491 but was reduced to $1013.85 by debits of $121,778.05.  (Ex. Q, at 1.)  AWS managed to accumulate fifty insufficient fund charges that month.  (Ex. Q.)  The account also had negative balances on thirteen of the twenty-four days reported on the Daily Balance Summary.  (Ex. Q.)

According to its September 30, 2012 account statement, AWS started the month with a mere $1013.85.  (Ex. R.)  Over the course of the month, the debtor and his wife made deposits or had credits of $68,356.75 against withdrawals of $70,045.09 plus service charges of $2.71 for a balance of negative $677.20 as of September 30, 2012.  (Ex. R.)

Coleman and the debtor executed the Contract on September 12, 2012.  (Ex. A.)  On that day, AWS had a balance in its checking account of negative $2242.37.  (Ex. R.)  By that same date, AWS had accumulated sixteen insufficient fund charges against its account.  (Ex. R.)  On September 13, 2012, Coleman delivered a cashier's check in the amount of $35,000 to Anna

---

[2] Insufficient fund charges appear to be assessed at $17.00 per charge; thus, the total number of charges incurred during a given monthly statement are calculated on multiples of seventeen.

Fields.  She deposited the check that same day in the AWS business account with Arvest Bank.

(Ex. B.)

Within a week, the $35,000 deposit was gone.  In fact, the majority was depleted within

two business days.  (Ex. R.)  The Arvest Bank statement for September reflected the following:

**Table A:  AWS Arvest Bank Account Statement from September 12–September 21, 2012**

| September 12 - Wednesday Account balance -2242.37 | | | |
|---|---|---|---|
| September 13 – Thursday | | | |
| **Transaction Type** | | **Amount** | **Payee** |
| Deposit | 41,905.00 (including the 35,000 deposit from Coleman) | | |
| Check No. 30955 | | 105.10 | Shell |
| Check No. 47103 | | 240.79 | Barco Premium Finance |
| Check No. 47104 | | 100.00 | Kent Sutherland |
| Check No. 47114 | | 107.00 | Walter Barnhardt |
| Check No. 47115 | | 1282.68 | Arkansas Blue Cross Blue Shield |
| | **Date Total** | **1835.57** | |
| | **Cumulative Total** | **1835.57** | |
| September 14 – Friday | | | |
| Check No. 30953 | | 50.00 | Rickey Brown |
| Check No. 30957 | | 500.00 | Cash |
| Check No. 30958 | | 500.00 | S.O.C.C. |
| Check No. 47105 | | 1100.00 | Rick Ferguson |
| Check No. 47106 | | 1500.00 | R & R Advertising Services, LLC |
| Check No. 47107 | | 632.89 | Robert S. Van Nostrand |
| Check No. 47108 | | 150.00 | William Mijangos |
| Check No. 47109 | | 350.00 | Integrated Bookkeeping & Financial Services |
| Check No. 47110 | | 1237.44 | Arvest Mortgage |
| Check No. 47111 | | 1800.00 | Anna Fields |
| Check No. 47112 | | 200.00 | Rafael Anguanino |
| Check No. 47113 | | 300.00 | Anna Fields |
| Check No. 47117 | | 1655.00 | Carl Gray |
| Check No. 47118 | | 300.00 | Gary Montgomery |
| Check No. 47119 | | 300.00 | Bill Thornton |
| Electronic Transaction | | 21.83 | Whole Hog Café |
| Electronic Transaction | | 517.54 | All American Building |

11

| | | | |
|---|---|---:|---|
| Electronic Transaction | | 1908.23 | Window Mart Manufacturing |
| Electronic Transaction | | 45.35 | Sherwood Express Lube |
| Electronic Transaction | | 35.26 | Mapco Express |
| Electronic Transaction | | 55.10 | United States Postal Service |
| Electronic Transaction | | 112.17 | Kroger |
| | **Date Total** | **13,270.81** | |
| | **Cumulative Total** | **15,106.38** | |
| September 15-16 – Weekend | | | |
| None | | | |
| | **Date Total** | **0.00** | |
| | **Cumulative Total** | **15,106.38** | |
| September 17 – Monday | | | |
| Check No. 47120 | | 1500.00 | Pearson Siding |
| Electronic Transaction | | 9943.54 | All American Building |
| Electronic Transaction | | 635.31 | Southern Barter Ex. |
| Electronic Transaction | | 6.00 | Boomerang Car Wash |
| Electronic Transaction | | 164.99 | Walmart Super Center |
| Electronic Transaction | | 305.83 | AT&T |
| | **Date Total** | **12,555.67** | |
| | **Cumulative Total** | **27,662.05** | |
| September 18 – Tuesday | | | |
| Check No. 30960 | | 300.00 | Cash |
| Electronic Transaction | | 165.36 | SBC Discount v. MC-Disc |
| Electronic Transaction | | 58.29 | TLF Wesley Berry Flower |
| Electronic Transaction | | 50.00 | HSBC Card Services (phone payment) |
| | **Date Total** | **573.65** | |
| | **Cumulative Total** | **28,235.70** | |
| September 19 – Wednesday | | | |
| Check No. 47121 | | 1200.00 | John Redditt |
| Check No. 47135 | | 1400.00 | Realty Property Management |
| Electronic Transaction | | 100.00 | ATM Withdrawal |

| | | | |
|---|---|---|---|
| Electronic Transaction | | 54.24 | All American Building |
| Electronic Transaction | | 32.00 | Check Law Recovery |
| | **Date Total** | **2786.24** | |
| | **Cumulative Total** | **31,021.94** | |
| September 20 – Thursday | | | |
| Check No. 30959 | | 75.00 | KAAY |
| Check No. 30961 | | 110.47 | Shell |
| Check No. 47123 | | 1788.00 | Pearson Siding |
| Check No. 47124 | | 367.98 | Pearson Siding |
| Electronic Transaction | | 90.78 | All American Building |
| | **Date Total** | **2432.23** | |
| | **Cumulative Total** | **33,454.17** | |
| September 21 – Friday | | | |
| Check No. 30965 | | 1000.00 | Rick Ferguson |
| Check No. 30966 | | 800.00 | Rafael Anguanino |
| Check No. 47122 | | 749.07 | Gary Montgomery |
| Check No. 47129 | | 500.00 | Gary Montgomery |
| Check No. 47130 | | 1240.00 | John Redditt |
| Check No. 47132 | | 632.90 | Robert S. Van Nostrand |
| Check No. 47133 | | 326.37 | Cash |
| Check No. 47134 | | 100.00 | Jeremy J. Langley |
| | **Date Total** | **5348.34** | |
| | **Cumulative Total** | **38,802.51** | |

(Ex. R.) The debtor made no effort to either use or retain any of Coleman's down payment for Coleman's project, despite the lack of any other funds to complete the project.

As stated above, the debtor testified that he did not think he was going out of business in September 2012 because of other ongoing projects that were generating income. An analysis of the Arvest Bank statement for the month of September suggests otherwise. (Ex. R.) Specifically, AWS started September 2012 with a balance of $1013.85. (Ex. R.) Before the September 13 deposit of Coleman's check, the account statement reflected two deposits of $107 and $5764. (Ex. R.) Despite those two deposits, AWS still had an account balance of negative $2242.37 on September 12, 2012. (Ex. R, at 4.) Thereafter, the following deposits were made.

13

| September 13, 2012 | 41,905 (inclusive of Coleman's 35,000 down payment or 6905 exclusive of Coleman's down payment |
|---|---|
| September 14, 2012 | 1336.25 |
| September 17, 2012 | 50.00 |
| September 19, 2012 | 175.00 |
| September 21, 2012 | 3900.00 |
| September 21, 2012 | 250.00 |
| September 21, 2012 | 5000.00 |
| September 25, 2012 | 5953.00 |
| September 27, 2012 | 2337.50 |
| September 28, 2012 | 425.00 |
| **Total** | **61,331.75** |

(Ex. R.)

Excluding Coleman's $35,000 down payment from the AWS deposits commencing September 13—a date when AWS already had a balance of negative $2242.37—AWS deposited $26,331.75. (Ex. R.) Despite these collective deposits, including Coleman's, AWS had fully expended all of its deposits and concluded the month with a balance of negative $677.20 as of September 30. (Ex. R.) Thus, AWS not only failed to survive on its other projects, but it also failed to survive even with the additional injection of Coleman's $35,000—an amount representing over half of the entire month's deposits and credits. (Ex. R.) Further, Coleman's $35,000 was not the only lagniappe on September 13, 2012. The deposit slip for that day included a check for $6905.00 with a reference to "Johnson," an amount outstanding when Anna Fields filed her December 2012 bankruptcy. (Ex. J, Sch. F, at 22; Ex. R.)

AWS started the month of October 2012 with a balance of negative $677.20 and finished the month with a balance of negative $791.25. (Ex. S.) Over the course of the month, AWS incurred twenty-nine insufficient fund charges and stopped payment on three checks. (Ex. S, at 1–2.) On fourteen of the reported twenty-three days, AWS had a negative daily balance. (Ex. S.)

AWS's November 30, 2012 account statement showed that the negative $791.25 balance decreased to a negative $1.28 balance with $1850.00 in deposits, $1057.00 in withdrawals, and $3.03 in service charges. (Ex. T.) The only check honored in November was one for $500 dated November 2, 2012, to Rauch-Milliken International, Inc. (Ex. T.)

### 3. The Fields' Personal Finances

The debtor and Anna Fields were also in severe personal financial distress in the spring, summer, and fall of 2012, as evidenced by their joint bank account statements from Arvest Bank. Anna Fields testified that they were basically using their overdraft protection of $1000 to cover living expenses. Also, Anna Fields would on occasion obtain funds from the AWS Arvest account for personal use.[3]

At trial, Coleman introduced the Fields' personal bank statements from May through December 2012. (Ex. U.) Their personal account reflected a balance of negative $820 on the May 22 account statement with at least twenty-four insufficient fund charges. (Ex. U, at 1–2.) The ending balances for June, July, and August, respectively, were negative $1028.55, negative $1005.59, and negative $904.88. (Ex. U.) The bank statements also reflected progressively less activity during the summer of 2012 in the form of checks and electronic activity with a continuing pattern of excessive overdraft charges. (Ex. U.) The Fields became delinquent on their car and mortgage payments in July of 2012.

The debtor and his wife had a beginning balance on August 22, 2012, of negative $904.88 and finished the month on the September 20 statement with a balance of negative $699.48. (Ex. U, at 20.) The only deposit occurred on September 14, 2012, the day after the

---

[3] Anna Fields stated that many of the cash withdrawals from the AWS account in her name were for the purpose of honoring bounced checks, but she conceded that the balance of the withdrawals may have been for personal use.

debtor deposited Coleman's $35,000 check, for $1150.  (Ex. U, at 22.)  The deposit slip denoted two checks were deposited: $1800 and $300.  (Ex. U, at 22.)  Of that amount, Anna Fields withheld $950 in cash resulting in the $1150 deposit.  (Ex. U, at 22.)  Correspondingly, Anna Fields wrote checks to herself out of the AWS account on September 14, 2012, for $1800 and $300.  (Ex. R, at 9.)  The Fields' personal account reflected only three transactions in the month of September 2012: club membership dues by electronic transfer of $36.72, a money market withdrawal of $70 to Anna Fields, and a check dated September 14, 2012, to OSCE [sic] Clearinghouse SDU for $701.88.  The debtor clearly utilized AWS funds to pay his outstanding child support obligation.

The Fields' joint checking account reflected very few checks honored, minimal deposits, and an abundance of overdraft charges during October, November, and December of 2012.  The account never had a positive balance in any of the three months.  (Ex. U.)  On December 7, 2012, Anna Fields filed her personal chapter 7 bankruptcy proceeding.  (Ex. J.)

## C. Damages

Coleman seeks damages in the amount of $96,557.88, which represents the $35,000 deposit paid by Coleman and the sum of Coleman's costs in completing the original project. (Ex. C.)  Coleman also seeks costs and attorney's fees.  The debtor did not substantively discredit this amount.[4]  Coleman is entitled to his down payment of $35,000.  After subtracting the down payment from Coleman's damages figure, the actual project completion cost was $61,557.88.  (Ex. C.)  The original Contract was for $67,114.  (Ex. A.)  Thus, Coleman did not suffer a pecuniary loss for the breach as his cost of cover did not exceed the original Contract amount.

---

[4]  Coleman added some extras to the original scope of the Contract but did not include those amounts in his damage calculations.

Coleman proved attorney's fees of $2000 related to his pursuit of the debtor in state court. Additional attorney's fees and costs have accrued based on the preparation and trial of this matter.

### III. Discussion

### A. Damages, Attorney's Fees, and Costs

### 1. Damages

Coleman seeks damages under Arkansas law for breach of contract, unjust enrichment, fraud, and violation of the Arkansas Deceptive Trade Practices Act. The debtor concedes and does not contest the indebtedness. Accordingly, under any theory, the debtor owes Coleman $35,000 representing the down payment he received. The debtor could only speculate that he spent a very small portion of the down payment, anywhere from $600–$1100, on the actual project. That speculation does not save the debtor from his obligation for the full amount; the debtor was unable to demonstrate that Coleman received any value from that modest amount, if that modest amount was even spent on Coleman's project.

Under Arkansas law, "damages recoverable for breach of contract are those damages that would place the injured party in the same position as if the contract had not been breached." *Spann v. Lovett & Co., Ltd.*, 389 S.W.3d 77, 91 (Ark. App. 2012) (citing *Dawson v. Temps Plus, Inc.*, 987 S.W.2d 722 (Ark. 1999)). Furthermore, "[d]amages must arise from the wrongful acts of the breaching party." *Id.* In contrast, "[c]onsequential damages are 'damages that do not flow directly and immediately from the breach' of a contract, 'but only from some of the consequences or results of the breach.'" *Iberg v. Prewett* (*In re Iberg*), 395 B.R. 83, 94 (Bankr. E.D. Ark. 2008) (citing *Reynolds Health Care Serv., Inc. v. HMNH, Inc.*, 217 S.W.3d 797, 803 (Ark. 2005)).

Coleman is entitled to damages in the amount of $35,000 representing the full amount of his down payment. The actual project completion cost was $61,557.88, after subtracting the down payment. (Ex. C.) The original Contract was for $67,114. (Ex. A.) Accordingly, Coleman did not suffer damages over and above his misdirected down payment. Coleman did not prove any consequential damages justifying an additional award. This amount is clearly recoverable on the basis of breach of contract or unjust enrichment.

## 2. Attorney's Fees

Coleman is also entitled to a reasonable attorney's fee. In determining the reasonableness of attorney's fees requested in an adversary proceeding, the court must look to Arkansas law. Arkansas Code Annotated 16-22-308 provides as follows:

> In any civil action to recover on an open account, statement of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

ARK. CODE ANN. § 16-22-308 (2015). Since the debtor conceded that he breached the Contract with Coleman, section 16-22-308 applies, and the court must determine what "reasonable attorney's fee" should be awarded. "Under Arkansas case law, there is no fixed formula to determine what would be a reasonable fee, rather a court should be guided by the following factors:"

> (1) [T]he experience and ability of the attorney;
> (2) [T]he time and labor required to perform the service properly;
> (3) [T]he amount in controversy and the result obtained in the case;
> (4) [T]he novelty and difficulty of the issues involved;
> (5) [T]he fee customarily charged for similar services in the local area;
> (6) [W]hether the fee is fixed or contingent;
> (7) [T]he time limitations imposed upon the client in the circumstances;
> (8) [T]he likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the attorney.

*Fowler v. First State Bank of Crossett* (*In re Fowler*), 395 B.R. 647, 651 (Bankr. W.D. Ark. 2008).

Coleman is awarded the sum of $2000.00 in attorney's fees representing the amount paid to George Carder, a lawyer to pursue his claim against the debtor in state court. Furthermore, Lyndsey Dilks is hereby directed to file a verified statement detailing her attorney's fees within fifteen days of the entry of this opinion and order. The debtor shall have ten days to respond or otherwise object to the fee request. Thereafter, without a hearing, the court will determine the appropriate fee amount.

### 3. Costs

Federal Rule of Bankruptcy Procedure 7054(b) specifically provides that "[t]he court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides." FED. R. BANKR. P. 7054(b) (2015). Although Federal Rule of Bankruptcy Procedure 7054 "presumes an award of costs to the prevailing party . . . the [bankruptcy] court has substantial discretion in awarding costs." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 762 (8th Cir. 2006). The court's "discretion is subject to 28 U.S.C. § 1920," which sets forth the costs to which a prevailing party may be entitled to collect. *Fowler*, 395 B.R. at 652–53. Section 1920 provides that the "court may tax as costs the following[.]"

> (1) Fees of the clerk and marshal;
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920 (2015); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 579 F.3d 894, 897 (8th Cir. 2009). Once the prevailing party complies with 28 U.S.C. § 1920 by filing a bill of costs, "[t]he losing party must satisfy a heavy burden when asserting that he should be excused from paying costs and affirmatively establish that the costs either fall outside the parameters of § 1920, were not reasonably necessary to the litigator, or that the losing party is unable to pay." *Fowler*, 395 B.R. at 653. Coleman is directed to include a separate itemization of costs in his attorney's fee request.

Coleman also seeks to have his damages, including attorney's fees and costs, excepted from the debtor's general discharge pursuant to 11 U.S.C. § 523. Each basis is discussed in detail below.

### B. 11 U.S.C. § 523(a)(4)

"Section 523(a)(4) excepts debts 'for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.'" *Arvest Mortg. Co. v. Nail* (*In re Nail*), 680 F.3d 1036, 1038 (8th Cir. 2012). "Whether a relationship is a 'fiduciary' one within the meaning of § 523(a)(4) is a question of federal law." *Reshetar Sys., Inc. v. Thompson* (*In re Thompson*), 686 F.3d 940, 944 (8th Cir. 2012) (citing *Nail*, 680 F.3d at 1039). The term "fiduciary" has been defined "in a 'strict and narrow sense,' and therefore does not embrace trustees of constructive trusts imposed by law because of the trustee's malfeasance." *Id.* (citing *Hunter v. Philpott*, 373 F.3d 873, 876 (8th Cir. 2004)). Furthermore, "[s]imply labeling a particular relationship as a 'trust' is insufficient to create a fiduciary capacity under the Bankruptcy Code." *EBCO Constr. Group, LLC, v. Garretson* (*In re Garretson*), 377 B.R. 214, 222 (Bankr. E.D. Ark. 2007) (citation omitted). Rather, the "fiduciary capacity must arise from an express or technical trust created prior to the defalcation and without reference to it." *Int'l Fidelity Insur. Co. v. Herndon*

20

(*In re Herndon*), 277 B.R. 765, 769 (Bankr. E.D. Ark. 2007). "In fact, "[a] mere contractual relationship is less than what is required to establish the existence of a fiduciary relationship." *Garretson*, 377 B.R. at 222.

"Trusts satisfying § 523(a)(4) can be created by state statute or by common law, as well as by contract." *Thompson*, 686 F.3d at 944. "A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms 'trust' or 'fiduciary.' Rather, to meet the requirements of § 523(a)(4), a statutory trust must (1) include a definable res and (2) impose 'trust-like' duties." *Nail*, 60 F.3d at 1040 (citation omitted).

A fiduciary relationship did not exist between the parties upon the signing of the Contract, and Coleman failed to articulate any provision under Arkansas law that would establish an express trust. Additionally, Coleman failed to present any evidence of embezzlement or larceny. Thus, Coleman did not meet his burden of proof pursuant to section 523(a)(4).

### C.  11 U.S.C. § 523(a)(6)

Coleman also contends that his damages should be excepted from discharge pursuant to section 523(a)(6). Section 523(a)(6) prohibits a debtor from discharging debts "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6) (2015). "To establish that a debt is nondischargeable consistent with this exception, the party seeking to prevent discharge must show by a preponderance of the evidence that the debt is for both 'willful . . . injury' and 'malicious injury.'" *Prewett v. Iberg* (*In re Iberg*), 395 B.R. 83, 89 (Bankr. E.D. Ark. 2008) (citing *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir. 2008)).

Although the debtor admits and this court finds that the debtor breached the Contract, "it is a well-settled principle of law that 'a simple breach of contract is not the type of injury

addressed by § 523(a)(6).'" *Id.* at 89–90 (citing *Snoke v. Riso* (*In re Riso*), 978 F.2d 1151, 1154 (9th Cir. 1992); *Commc'n Workers of Am. v. Akridge* (*In re Akridge*), 71 B.R. 151, 154 (Bankr. S.D Cal. 1987) (noting that "debts excepted from discharge under § 523(a)(6) relate solely to tortious liabilities, not debts stemming from breach of contract")). Thus, to except a debt under this subsection, a creditor must prove that the debtor engaged in "malicious and willful tortious conduct." *Iberg*, 395 B.R. at 90 (citation omitted).

In *Iberg*, this court considered whether a debtor's failure to timely complete a construction project in a workmanlike manner pursuant to the parties' contract constituted a willful and malicious injury. *Id.* at 89. Citing Arkansas law, this court noted that "a breach of contract claim without an allegation of a separate tort does not render the breach tortious." *Id.* at 90 (citing *Quinn Comp., Inc. v. Herring-Marathon Group, Inc.*, 299 Ark 431, 431–33 (Ark. 1989)). Similar to the holding in *Iberg*, Coleman proved and the debtor conceded that he breached the Contract; however, the debtor's breach does not rise to the level of a willful and malicious injury.

### D. 11 U.S.C. § 523(a)(2)(A)

Pursuant to 11 U.S.C. § 523(a)(2)(A), a discharge under section 727 does not discharge a debtor from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]" 11 U.S.C. § 523(a)(2)(A) (2015). As this court has stated before, "[s]ection 523(a)(2)(A) provides three distinct, but often intermingled, bas[e]s for nondischargeability: false pretenses, a false representation, or actual fraud." *Quality Foods, Inc. v. Donckers* (*In re Donckers*), Ch. 7 Case No. 5:05-bk-75192, Adv. No. 5:05-ap-07158, slip op. at 3 (W.D. Ark. Apr. 26, 2006).

### 1. False Pretenses

The debtor executed the Contract and obtained the $35,000 down payment by false pretenses; accordingly, this debt is nondischargeable.  In *Moen*, the United States Bankruptcy Appellate Panel for the Eighth Circuit distinctly defined the first basis for nondischargeability of a debt—false pretenses—as

> involv[ing] implied misrepresentation or conduct intended to create and foster a false impression.  [W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression.  This is the basis of the false pretenses provision of Section 523(a)(2)(A).

*Merchants Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (citations omitted).  In *Anderson*, the bankruptcy court further elaborated on the definition of false pretenses by noting that it can include

> a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.  False pretense may, but does not necessarily, include a written or express false representation.  It can consist of silence when there is a duty to speak.

*Check Control, Inc. v. Anderson* (*In re Anderson*), 181 B.R. 943, 950 (Bankr. D. Minn. 1995) (citation omitted).

The debtor submitted a proposal to Coleman to complete a home improvement project at a cost of $67,114.  Immediately, two factors reasonably and nearly unequivocally assured Coleman of the project's completion.  First, the debtor's assurances that he was capable of completing the job in a timely and professional manner while overseeing the purchase and administration of materials and labor.  Second, the debtor asked for and obtained from Coleman a down payment of over half the completion price, an amount sufficient to assure substantial if not complete performance under the Contract.

23

The Contract is dated September 12, 2012. (Ex. A.) Well before that date, however, both AWS and the Fields were in severe financial distress. The exact reasons are unknown; however, it is evident from the spring through fall bank statements that the business was undercapitalized and consistently had difficulty coordinating receivables and payables. The debtor was well aware of his problem salesman, Scott Williams. He did not have a "bad month" attendant to a sudden discovery of an employee's defalcations. As is evident from the bank statements, the numerous lawsuits, and Anna Fields's schedules, AWS owed an extraordinarily large amount of debt—approximately $400,000—by September 2012. (Exs. E, J.) Yet, AWS lacked capital and had no assets whatsoever. Its only resource was income from jobs that it used to buy materials and hire employees.

As stated above, the debtor testified that he did not think AWS was going out of business in September 2012 because he had other ongoing projects that were generating income. His testimony notwithstanding, AWS had insufficient other business that month or that fall to generate enough profit to complete Coleman's project or maintain AWS as a viable, ongoing business entity. Specifically, AWS started September 2012 with a balance of $1013.85. (Ex. R.) Prior to the September 13 deposit of Coleman's check, AWS had, on September 12, 2012, an account balance of negative $2242.37. (Ex. R, at 4.)

Despite Coleman's $35,000 and the Johnsons' $6905—neither of which was used to complete either project—the AWS account had a balance of negative $677.20 as of September 30. (Ex. R.) The debtor cannot reasonably contend that he had sufficient extraneous resources from other projects to complete the Contract in September or the fall of 2012.

At the time the debtor entered into the Contract with Coleman, he fostered an impression of competence and ability to complete the project knowing that he did not have the resources to

do so; he failed to dedicate any more than an unspecified minuscule amount of the down payment to Coleman's project; and he immediately squandered Coleman's down payment. Rather than commit any part of the down payment to that effort, he promptly used the deposit to pay other creditors, vendors, salesmen, and employees.

The debtor and his wife were personally in financial distress in the spring, summer, and fall of 2012 as evidenced by the bank account statements from their joint banking account, their July 2012 mortgage and car loan delinquencies, and testimony that they used their overdraft protection to cover living expenses. During this period, Anna Fields made numerous cash withdrawals from the AWS account in her name. Anna Fields conceded that many of the withdrawals were for personal use, including payments on the debtor's child support obligation and their home mortgage. (Ex. R, OCSE Check # 30958, Arvest Mortgage Check # 47110.)

Coleman introduced the Fields' personal bank statements from May through December 2012. (Ex. U.) The ending balances for May, June, July, August, and September, respectively, were negative $820, negative $1028.55, negative $1005.59, negative $904.88, and negative $699.48. (Ex. U.) The bank statements also reflected fewer checks, diminished electronic activity, and a continued pattern of excessive overdraft charges in the summer of 2012. (Ex. U.) The Fields' joint checking account also reflected very few checks honored, minimal deposits, and an abundance of overdraft charges during October, November, and December of 2012. The account never reflected a positive balance in any of these three months. (Ex. U.)

On December 7, 2012, Anna Fields filed her personal chapter 7 bankruptcy proceeding. (Ex. J.) She accumulated unsecured, nonpriority debts of $406,920.51 as of December 7, 2012, which overwhelmingly related to AWS's operations. (Ex. J, at 29.)

Quite simply, the debtor and AWS were out of business by September 2012. It is not per se wrong to use a down payment on other projects; most businesses operate on revolving receivables. In this case, however, the debtor seized an opportunity to obtain a significant down payment and immediately used that money both for business and personal purposes with no conceivable or reasonable expectation that he would be able to complete the project. When called to account, he dissimilated by referencing employee defalcations and a "bad month." Both excuses disguised his prior and ongoing awareness of just how serious his business circumstances were and the improbability of being able to complete Coleman's project with any funds other than Coleman's squandered down payment. Accordingly, the debt is nondischargeable pursuant to section 523(a)(2)(A).

An additional requirement of section 523(a)(2)(A) is that the false pretenses or false representations not be a statement respecting the debtor's financial condition. The debtor neither raised nor addressed this issue at trial. The debtor, however, did not obtain the down payment through a statement respecting his financial condition. Rather, he readily entered into the Contract and accepted the $35,000 down payment, failed to disclose that AWS was going out of business, and failed to disclose that he had no capacity or ability to perform the Contract—all circumstances that the debtor knew at the time he executed the Contract.

## 2.  False Representations

The debtor also executed the Contract and obtained the $35,000 down payment by false representations, and, accordingly, that debt is nondischargeable. To prove a case under section 523(a)(2)(A) based on a false representation, a creditor must prove the following elements:

> (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representation; and (5) that the creditor

26

sustained the alleged loss and damage as the proximate result of the representation having been made.

*Moen*, 238 B.R. at 790 (quoting *Thul v. Ophaug* (*In re Ophaug*), 827 F.2d 340, 343 n. 1 (8th Cir. 1987).

In *Cole*, the court considered whether a debtor/contractor received money under false pretenses or pursuant to a false representation when he entered into a contract and received partial payment for the replacement of the creditor's roof with "the apparent knowledge that [he] was encountering financial difficulty." *Galvin v. Cole* (*In re Cole*), 164 B.R. 947, 949 (Bankr. N.D. Ohio 1993). When the debtor failed to appear to commence work, the creditor contacted the debtor, and he agreed to begin work one week later. *Id.* at 948. Approximately one week later, the debtor visited the creditor to inform him that he would be closing his business. *Id.*

In analyzing the facts and applying the standards set forth in section 523(a)(2)(A), the court noted that "[t]he evidence unequivocally shows that the money [the debtor] received from [the creditor] was obtained by false pretenses and a false representation. [The debtor] entered into a contractual obligation with the apparent knowledge that [he] was encountering financial difficulty." *Id.* at 949. The court elaborated further, "[t]he sequence of events in this case . . . establishes a course of conduct whereby [the debtor] knowingly entered into agreements with [the creditor] for purposes of obtaining money." *Id.* at 950. The court continued, "[w]ith knowledge that he did not have the requisite materials or the money to purchase materials, [the debtor] perpetuated the misrepresentation by promising to commence work on a date certain. When [the debtor] advised [the creditor] that he was terminating his business, [the debtor] had already spent [the creditor's] money." *Id.* In ruling that the debtor "could foresee the imminent closing of his business" at the time of signing the contract and "had no intentions to further obligate himself on the purchase of" supplies, the court held that the debtor "obtained money

27

from [the creditor] by false pretenses and a false representation"; thus, the debt was excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). *Id.*

Coleman testified that it was important to him that the debtor was a licensed contractor capable of timely and appropriately obtaining materials and labor for the project. The debtor conceded that he represented to Coleman that he was capable, had the ability to obtain labor and necessary materials, and could complete the job in a timely and professional manner. Further, the debtor admitted that Coleman entered into the agreement based on his representations. Thus, three of the five elements of a false representation are met by the debtor's own admission: (1) that the debtor made a representation; (4) that the creditor justifiably relied on such representation; and (5) that Coleman sustained damages as a proximate result of the representation.

The facts introduced at trial sufficiently demonstrate that the other two elements are met: (2) that at the time the debtor knew the representation was false and (3) that the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving Coleman. Many of the facts supporting these conclusions have been set out in the section concerning false pretenses above. To summarize, the debtor personally and professionally through AWS was in severe financial distress by September 12, 2012. AWS literally did not have a single dollar in the bank. The company had not been able to timely address accounts payables, was mired in overdrafts, had minimal assets and no capital, and had accumulated over $400,000 in debt with significant tax consequences. The debtor knew AWS was going out of business. AWS did not merely have a "bad month" occasioned by a salesman's defalcations. Scott Williams was a known and long-standing problem. The business collapsed by September;

the company could not even survive that month with a $35,000 cash infusion from Coleman supplemented by a $6905 cash infusion from the Johnsons.

As in *Cole*, AWS was no longer a viable business in September 2012, at the time the debtor executed the Contract with Coleman. The debtor, perhaps desperate for a band-aid, took money from Coleman that he neither dedicated to Coleman's project nor entertained any realistic or reasonable prospect of completing. Perhaps desperation drove the debtor's false representations. Regardless, they were false, and Coleman suffered damages as a direct consequence.

### 3. Actual Fraud

The final basis for declaring a debt nondischargeable pursuant to section 523(a)(2)(A) is actual fraud. "Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another— something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Moen*, 238 B.R. at 790 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)). Thus, actual fraud "consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." *Id.* at 791 (citation omitted). Because of the findings and conclusions outlined above, the court need not consider actual fraud as a basis for nondischargeability.

### IV. Conclusion

For the reasons stated above, Coleman is awarded damages in the amount of $35,000. Coleman shall have fifteen days from the entry of this Memorandum Opinion and Order within which to submit a verified statement of his costs and attorney's fees incurred. The debtor shall have ten days thereafter within which to respond or otherwise object to the fee request. Without

29

a hearing, the court will determine the appropriate costs and fee amount.  Further, the damages, costs, and attorney's fees are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), for false pretenses and false representations.  A final order and separate judgment shall be entered after considering the costs and fee request as stated above.

IT IS SO ORDERED.

Dated this 20th day of January, 2016.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:     Lyndsey D. Dilks
        Clinton W. Lancaster
        Richard M. Coleman, Jr.
        C.R. Fields, III
        Frederick S. Wetzel, III